cc: see G - 75 attached

JS - 6

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

In re:                                         **CASE NO. SA CV03-1354 DOC**
**J HOWARD MARSHALL, III, and**    )
**ILENE O. MARSHALL,**                 )    BAP NO:    CC-03-01460 CACD
                                             )    USBC NO:  LA02-30769-SB
          **Debtors**                       )
                                             )    **O R D E R AFFIRMING THE**
_____)    **BANKRUPTCY COURT'S**
                                             )    **DECISIONS:**
                                             )    **[1] DENYING RECUSAL OR**
                                             )    **REASSIGNMENT;**
**ELAINE T. MARSHALL,**              )    **[2] CONFIRMING**
                                             )    **REORGANIZATION PLAN; AND**
          **Appellant,**                    )    **[3] DENYING MOTION TO**
                                             )    **DISMISS**
          **v.**                            )
                                             )
**J. HOWARD MARSHALL, III, and**   )
**ILENE O. MARSHALL,**                 )
                                             )
          **Appellees.**                   )
_____)

Appellant Elaine T. Marshall ("Elaine"), as Successor Trustee of the Bettye B. Marshall

Living Trust, Trustee of the J. Howard Marshall, II Marital Trust Number Two, and Trustee of

the E. Pierce Marshall Family Trust Created Under the Bettye B. Marshall Living Trust

Indenture Dated October 30, 1990, appeals from Orders of the Bankruptcy Court, United States

Bankruptcy Judge Samuel Bufford ("Judge Bufford" or the "Bankruptcy Court") Denying the

Trusts' Motions for Reassignment or Recusal, Confirming the Debtors' First Amended Chapter

11 Plan, and Denying the Trusts' Motion to Dismiss.  After considering the parties' Opening Briefs, and the appellant's Reply Brief, as well as the parties' oral argument, and for the following reasons the Court hereby AFFIRMS the Bankruptcy Court's Order Denying the Trusts' Motion for Reassignment or Recusal, AFFIRMS the Bankruptcy Court's Order Confirming the Debtors' First Amended Chapter 11 Plan, and AFFIRMS The Bankruptcy Court's Order Denying the Trust's Motion to Dismiss.

## BACKGROUND

Texas tycoon J. Howard Marshall II ("J. Howard") died August 4, 1995.  He was survived by his two sons, E. Pierce Marshall ("Pierce") and J. Howard Marshall III ("Howard"), and wife Vickie Lynn Marshall ("Vickie").  Pierce, as Trustee of a number of trusts created during J. Howard's lifetime, was a creditor in the present bankruptcy case.  He is succeeded by Elaine, his successor Trustee and the appellant in the current proceeding.  The debtors in this matter are Howard and his wife Ilene O. Marshall ("Ilene").  They are appellees in the current proceeding.

When he died, J. Howard left an estate plan which included Pierce, but not Howard or Vickie.  Both Howard and Vickie challenged the estate plan in the Texas Probate Court (the "Probate Case").  Howard claimed that J. Howard orally promised that his assets would be distributed equally to Howard and Pierce when J. Howard repurchased voting shares of Koch Industries from Howard.  Pierce claimed, and a jury found, that Howard sold the shares of Koch Industries to J. Howard with the undisclosed intention to later claim that his father promised, as consideration for this sale, to treat Pierce and Howard equally.  The jury further found that Howard had committed fraud with malice. The Probate Court entered judgment on August 15, 2001, and amended judgments on October 15, 2001 and December 7, 2001 (the "Texas Fraud Judgment").  The judgment became final on February 11, 2001. The Texas Fraud Judgment is now worth more than $12 million.

Howard timely appealed in the Texas courts.  On January 31, 2002, he filed a Motion to Stay Execution of the Judgment, or Alternatively, to Lower the Amount of Security for Supersedeas.  At this time, he claimed his net worth to be $22,413,220 and stated that he was

1   unable to obtain a bond necessary to appeal.  Elaine claims that the parties reached an agreement

2   concerning a stay and the amount of the bond, but that Howard reneged, being unable to obtain

3   financing for the agreed bond.

4          In any case, Pierce moved to enforce the Probate Court's judgment.  On July 18, 2002,

5   the Probate Court asked Howard to consider voluntarily moving assets to Texas to satisfy the

6   judgment.  The Court set another hearing on July 25, 2002, to determine whether to order

7   Howard to do so.  Instead, Howard filed for bankruptcy on July 23, 2002, and filed notice of this

8   bankruptcy in the Probate Court the following day.

9          The Texas Probate Court also entered a judgment against Vickie.  Vickie claimed that

10  Pierce had wrongfully interfered with her expectancy of a gift from J. Howard.  The Probate

11  Court rejected this claim, and awarded Pierce $541,000 in fees and costs against Vickie.

12         Vickie filed for bankruptcy in the Central District of California, (the "Vickie Lynn Case")

13  and her case was assigned to Judge Bufford.  Vickie again claimed that Pierce had interfered

14  with her expectancy of a gift from J. Howard.  Pierce sought a determination that his claim

15  against Vickie was not subject to discharge in bankruptcy.  Judge Bufford rejected Pierce's

16  claim and ultimately awarded Vickie just shy of $475 million.

17         During the course of the Vickie Lynn Case, Judge Bufford became convinced that Pierce

18  was engaged in discovery abuses.  Specifically, he found that Pierce destroyed certain

19  documents, failed to respond to discovery requests, failed to produce a privilege log and

20  documents in camera, and failed to produce some documents in the possession of J. Howard's

21  lawyers, Edwin K Hunter and Jeff Townsend.  As a sanction for this purported misconduct,

22  Judge Bufford award $5,000 to Vickie in connection with a 1997 motion to compel.  Judge

23  Bufford issued other sanctions orders throughout the bankruptcy proceeding.

24         In September 1998 Pierce sought to withdraw the bankruptcy reference in the Vickie

25  Lynn Case.  District Judge Keller withdrew the reference in October 1998.  In early 1999, Judge

26  Bufford submitted a "secret memorandum" to "assist [Judge Keller] in his review of the matter."

27  On February 1, 1999, Judge Keller stayed the sanctions order.  The following day Judge Bufford

28  declared the stay invalid and issued a sanctions order deeming certain facts adverse to Pierce to

be established.  On March 9, 1999, Judge Keller vacated this order for lack of evidence.  After confirming receipt of the "secret memorandum," Judge Keller vacated his order withdrawing the case.  On May 20, 1999, Judge Bufford again issued a sanctions order deeming Vickie's allegations established.

Judge Bufford then conducted a five-day hearing on Vickie's claims.  On the first day of this hearing, he responded on the record to questions by a reporter, indicated that the case was related to the Probate Case, and discussed how members of the press should obtain public records or contact the Court.  Press reports concerning the case noted that Vickie had an "advantage" going towards trial because of Judge Bufford's negative impression of Pierce.

As the hearing progressed, Judge Bufford relied heavily on his sanctions order.  He refused to permit evidence contrary to the facts established in the sanction.  Ultimately, he found in Vickie's favor on her claim and awarded Vickie $449,754,134 in actual damages.  First, he based this decision on a "widow's election" theory that was not raised by Vickie.  On October 6, 2000, he revised this opinion, abandoning the "widow's election" theory and holding that the decision was justified based on the presumed facts adverse to Pierce.  On November 21, 2000, he assessed $25,000,000 in punitive damages.  He entered a final judgment for Vickie on December 29, 2000.

Pierce appealed to this Court, which ultimately reduced the actual damages to $44,300,000 but increased the punitive damages to the same amount based on Pierce's "willfulness, maliciousness, and fraud."   Pierce appealed this decision to the Ninth Circuit, which held, *inter alia*, that this Court lacked jurisdiction.  Vickie appealed to the Supreme Court and prevailed on this issue.  The Supreme Court then remanded to the Ninth Circuit, where the case remains.

On July 23, 2002, Howard and Ilene filed their voluntary petition under chapter 11 of the Bankruptcy Code.  Howard and Ilene filed an addendum under Local Bankruptcy Rule 1015-2.  Although the cases were admittedly not "related" under the definition used by the Local Rules, the addendum suggested that this case involved many of the same parties as the Vickie Lynn case. Based on this addendum, the clerk assigned this case to Judge Bufford.

4

1    On October 7, 2002, Pierce filed a motion for reassignment or recusal.  This motion was

2  denied at an October 29, 2002 hearing.  Judge Bufford then issued an Order to Show Cause why

3  the motion should not be denied and heard argument on January 23, 2003.  He again denied the

4  Recusal Motion on March 11, 2003.  He denied the Motion a final time on March 27, 2003.

5    On August 6, 2002, Howard and Ilene filed their first bankruptcy schedules listing their

6  assets at $8,391,904.  In this initial schedule, Howard and Ilene listed their stock portfolio as

7  having an unknown value, although Pierce claimed that it was worth more than $5,000,000.

8  Howard and Ilene filed an amended schedule on September 4, 2002.  This amended schedule

9  showed their assets being worth just over $13 million.

10    Pierce raised a number of irregularities with the amended schedule as well.  First, in the

11 amended schedule, Howard and Ilene valued their stock portfolio "as of July 16, 2002," a date

12 when the portfolio was trading at an abnormally low price.  According to Pierce, the

13 $4,746,407.38 valuation took into account stocks the debtors did not own and failed to take into

14 account stocks they did own.  Principally, on July 15, 2002, Howard and Ilene held 24,000

15 shares of Immunex Corporation stock.  The next day AmGen, Inc. purchased Immunex.

16 Consequently, AmGen stock made up the majority of Howard and Ilene's portfolio.  As a result

17 of this transaction, AmGen's stock was trading at its second lowest price for the year on July 16,

18 2002.  Howard and Ilene also listed no value for a debenture in favor of Howard, (the

19 "Debenture") that had been listed as a $6,050,000 asset in the Probate Court.   Although they

20 stated no value for the Debenture, Howard and Ilene provided a page-long description of the

21 Debenture in their schedules.  Pierce "conservatively" calculated the value of the Debenture at

22 $3,583,375.  Pierce also claimed that value of certain bank accounts were misstated.  Finally, he

23 claimed that the schedules improperly valued Howard and Ilene's partnership interests using a

24 book value approach versus market value.

25    In addition to the $11 million judgment, plus more than $1 million in interest, from the

26 Texas Probate Court, Howard and Ilene had additional actual and threatened liabilities.  At the

27 time their plan was confirmed, they had $16,375 in undisputed debts and $464,000 in other

28 disputed debts.  Further, another family member sued Howard for $5 million, and Pierce

5

1  threatened to sue for another $100 million.

2      Howard and Ilene filed their first plan of reorganization taking into account the $12

3  million Texas Fraud Judgment.

4      Pierce never filed a proof of claim in the bankruptcy proceeding.  The bar for doing so

5  passed on November 15, 2002.  Instead, on December 13, 2002, Pierce filed a Motion to Dismiss

6  the case under 11 U.S.C. § 1112(b) claiming that the debtors were acting in bad faith.  The

7  Bankruptcy Court denied the motion, finding that the Howard and Ilene filed in good faith.

8      On April 16, 2003, Howard and Ilene filed their first amended plan of reorganization (the

9  "Chapter 11 Plan").  Because Pierce did not have an allowed claim, he could not vote on the

10  plan.  The Chapter 11 Plan provided that Howard and Ilene would pay "General Unsecured

11  Claims" in full.  This included $16,375 in undisputed claims, which would be paid, and

12  according to Howard and Ilene, $464,000 in disputed claims, which would not.  The Plan also

13  provided for payment in full to three classes of secured creditors, all of which hold mortgages to

14  Howard and Ilene's real property.  Finally, the plan provided for payment in full to a

15  "convenience class" of unsecured claims for $25,000 or less.

16      Notably, the plan did not provide for any payment to Pierce, although it did purport to

17  discharge the Fraud Judgment.

18      On May 9, 2003, Pierce objected to the confirmation of the plan, claiming that

19  confirmation of the plan in favor of solvent debtors was unconstitutional.  The Bankruptcy Court

20  confirmed the plan nonetheless.

21      Pierce filed the present appeal on September 3, 2003, claiming that the Bankruptcy Court

22  erred by Denying his Motion for Recusal or Reassignment, Denying his Motion to Dismiss, and

23  Overruling his Objection to the Confirmation.

24      He sought a stay of these orders in the Bankruptcy Court, this Court, and the Ninth

25  Circuit.  This Court denied the stay claiming that Pierce lacked a likelihood of success on appeal

26  and irreparable harm.  The Ninth Circuit granted a stay pending appeal in this Court.  The

27  Circuit then stayed this Court's proceedings on the matter pending resolution of the Vickie Lynn

28  Case.  On October 3, 2007, the Ninth Circuit lifted the stay on this appeal in light of the Supreme

1    Court's decision in the Vickie Lynn case.

2    **STANDARD OF REVIEW**

3        The Court typically reviews challenged decisions of the Bankruptcy Court for abuse of

4    discretion.  *In re Stolrow's, Inc.*, 84 B.R. 167, 170 (9th Cir. BAP 1988) (dismissal for bad faith);

5    "A bankruptcy court abuses its discretion if it applies the law incorrectly or if it rests its decision

6    on a clearly erroneous finding of a material fact."  *In re Brotby*, 303 B.R. 177, 184 (9th Cir.

7    B.A.P. 2003); *In re So. Cal. Plastics, Inc.*, 165 F.3d 1243, 1245 (9th Cir. 1999).  To the extent

8    that the decision is based on an incorrect legal conclusion, review is plenary.  *United States v.*

9    *Furst*, 886 F.2d 558, 580 (3d Cir. 1989).

10       Whether the judge was required to recuse himself under § 455 involves both a legal and

11   factual determination: a) what the appropriate standard is for recusal; and b) whether the judge's

12   impartiality might reasonably be questioned.  To the extent that Elaine claims that Judge

13   Bufford's view of the law was incorrect, the Court reviews this decision *de novo*.

14       The legal determination of whether the Constitution prohibits confirming the chapter 11

15   plan of solvent debtor is also reviewed *de novo*.

16       A finding of bad faith is essentially a fact question reviewed for clear error.  *In re*

17   *Marsch,* 36 F.3d 825, 828 (9th Cir. 1994); *In re Villaneuva*, 274 B.R. 836, 840 (9th Cir. B.A.P.

18   2002).[1]  "Clear error exists only when the reviewing court is left with a definite and firm

19   conviction that a mistake has been committed."  *In re Brotby*, 303 B.R. 177, 184 (9th Cir. B.A.P.

20   2003).

21   **DISCUSSION**

22   **I.**   **REASSIGNMENT AND RECUSAL**

23       Elaine argues that Judge Bufford erred by failing to randomly reassign the case and by

24   refusing to recuse himself.  The Court addresses each purported error in turn.

25       **A.**   **Random Reassignment**

26

27       [1]This is not a case, like *Villanueva*, where the historical facts are established,

28   leaving only the application of law to fact.

7

1  Elaine contends that the case should have been randomly assigned and that the

2  assignment to Judge Bufford based on the "Addendum" to the Debtor's bankruptcy filing was

3  improper.  Thus, she argues, Judge Bufford's refusal to submit the case to random assignment

4  was error.

5  Assignment of cases is governed by 28 U.S.C. § 137, which provides that "[t]he business

6  of a court having more than one judge shall be divided among the judges as provided by the

7  rules and orders of the court."  Cases in this District are randomly assigned.  *See* General Order

8  224 § 1.2.  The General Orders of the Bankruptcy Court for the Central District provide an

9  exception to random assignment where cases are related.  U.S. Bankruptcy Court, C.D. Cal.,

10  General Order 99-02.  Local Bankruptcy Rule 1015-2 provides a list of relationships that render

11  two cases "related" for purposes of General Order 99-02 – e.g. where the debtors are the same,

12  spouses, partners, or have an interest in property that is the property of another bankruptcy

13  estate.

14  Although counsel for Howard and Ilene suggested at oral argument that the cases may be

15  related, they do not appear to fit in any of the relationships described in Local Bankruptcy Rule

16  1015-2.  Accordingly, the Court assumes that the cases were not, as a technical matter, related

17  cases under the Local Bankruptcy Rules and General Orders of this Court.

18  Random assignment is important chiefly because it precludes real or apparent bias by

19  preventing "judge shopping."  *In re Yagman*, 796 F.2d 1165, 1177-78 (9th Cir. 1986); *see also*

20  *Cruz v. Abbate*, 812 F.2d 571, 573-74 (9th Cir. 1987) (noting the importance of avoiding real or

21  perceived arbitrariness or unfairness.)  Leaving judge selection to chance assures that the deck is

22  not stacked against one party or another.  *United States v. Phillips*, 59 F. Supp. 2d 1178, 1180

23  (D. Utah 1999) (collecting authorities).  As the Ninth Circuit put it, General Order 224 "evinces

24  a policy of objectivity and fairness in the distribution of all matters . . . [which is] important to

25  the fair administration of justice . . .." *United States v. Flynt*, 756 F.2d 1352, 1356 n.2 (9th Cir.

26  1985).

27  Consequently, the Local Rules give no discretion to the clerk to assign cases on any basis

28  other than random selection.  General Order 224 § 1.2 ("Neither the Clerk nor any Deputy Clerk

8

1  shall have discretion in determining the judge to whom any civil case shall be assigned."); *see*

2  *also Phillips*, 59 F. Supp. 2d at 1184.   Judges, on the other hand, do have "inherent authority" to

3  transfer cases between them.  *See United States v. Martinez*, 686 F. 2d 334 (5th Cir. 1982)

4  ("District Judges have the inherent power to transfer cases from one to another for the

5  expeditious administration of justice." (quoting *United States v. Stone*, 411 F.2d 597, 598 (5th

6  Cir. 1969)).

7          However, Elaine does not merely ask this Court to determine that the Clerk improperly

8  assigned this matter to Judge Bufford.  She also does not ask the Court to assign a new or

9  different judge to the matter.  Instead, she asks the Court to use non-random assignment as a

10  reason to vacate all of Judge Bufford's decisions.

11          Assignment, even if improper, cannot support such a result.  There is no due process right

12  to random assignment.  *See United States v. Torbert*, 496 F.2d 154, 157 (9th Cir. 1974); *Cruz*,

13  *supra*.  As the Circuit has recognized, a party has no "vested right to any particular procedure."

14  *Torbert*, *supra*.  Aside from assuring that the proceedings are free from bias or partiality, the

15  selection procedure is committed to the discretion of the trial court.  *Cruz*, *supra*.  General Order

16  224 "is a housekeeping rule for the internal operation of the district court which has 'a large

17  measure of discretion in interpreting and applying' it...." *Torbert*, *supra*. (quoting *Lance, Inc. v.*

18  *Dewco Services, Inc.*, 422 F.2d 778, 784 (9th Cir. 1970)).

19          It would be absurd to reverse all of Judge Bufford's rulings merely because the

20  Bankruptcy Clerk failed to comply with a court-imposed administrative rule when assigning the

21  case.  This outcome is particularly far-fetched given that the cases, though not "related" under

22  the express terms of the Local Bankruptcy Rules, involve many of the same principals and many

23  related issues.  Efficiency is clearly favored by Judge Bufford presiding over this case.

24           Indeed, judges frequently transfer cases with more tenuous relationships than this case

25  and the Vickie Lynn case.  The duplication effort required for another judge to digest the storied

26  factual and procedural background shared in this and the Vickie Lynn case justifies, as a

27  practical matter, the decision to assign the case to Judge Bufford.  In all likelihood, had the case

28  been assigned to another judge, that judge would have transferred it to Judge Bufford for this

1   very reason.  Accordingly, any error in assigning the case to Judge Bufford was harmless.

2         Further, as discussed below, there has been no showing that Judge Bufford was biased or

3   prejudiced, or that a reasonable person could perceive as much.  Accordingly, the policies of

4   random assignment – i.e. avoiding bias and the appearance of impropriety – are not implicated

5   by the assignment.

6         In sum, Elaine has raised no error requiring reversal based on Judge Bufford's decision

7   not to require random assignment in this case.  Elaine cannot enforce any requirement that cases

8   be submitted to random assignment.  As a practical matter, the case should have been – and most

9   likely would have been – given to Judge Bufford in the interests of judicial economy.  Finally, as

10  discussed in the next section, there is no evidence of actual or reasonably perceived bias.

11        Accordingly, Judge Bufford's decision not to require reassignment is hereby

12  AFFIRMED.

13        **B.     Recusal**

14        A judge must recuse himself where "he has a personal bias or prejudice concerning a

15  party," or "in any proceeding in which his impartiality might reasonably be questioned."  28

16  U.S.C. § 455.  Under the latter, broader standard, the Court must determine whether an

17  objectively reasonable layperson might find that Judge Bufford's impartiality could reasonably

18  be questioned.  *Liteky v. United States*, 510 U.S. 540, 548, 114 S. Ct. 1147 (1994) (objective

19  standard); *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859, 108 S. Ct. 2194

20  (1988) (discussing objective standard); *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*,

21  244 F.3d 1128, 1144-45 (9th Cir. 2001) ("whether a reasonable person with knowledge of all the

22  facts would conclude that the judge's impartiality might reasonably be questioned." (quoting

23  *United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000))); *In re Kensington Int'l, Ltd.*, 368

24  F.3d 289, 302-303 (3d Cir. 2004) (reasonable layperson outside of judicial system).

25        Although apparent prejudice can arise from present or prior proceedings, *see Liteky*, 510

26  U.S. at 549, where there is no "extra-judicial source" the judge's opinions must express "a deep-

27  seated favoritism or antagonism that would make fair judgment impossible."  *Id.* at 555.  The

28  Supreme Court was careful to distinguish permissible "expressions of impatience,

10

dissatisfaction, annoyance, and even anger," from statements that express "deep-seated favoritism or antagonism." *Id.* at 555-56; *see also United States v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980) (Disqualification is justified by "an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes." ) Impartiality does not mean gullibility. *Liteky*, 510 U.S. at 551 (citing *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)).

In considering whether this standard is met, the Court must consider the totality of the circumstances and cannot pick apart the alleged basis for recusal. *See United States v. Bremers*, 195 F.3d 221, 228 n.2 (5th Cir. 1999) (considering totality of circumstances); *United States v. Furst*, 886 F.2d 558, 583 (3d. Cir. 1989). If the appearance of bias or prejudice is a close call, recusal is appropriate. *Boston's Children First*, 244 F.3d 164; *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995).

It is also elementary that due process requires a fair and neutral decision maker. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S. Ct. 1610 ("The requirement of neutrality has been jealously guarded by this Court."); *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001) ("A neutral judge is one of the most basic due process protections.") (citing *Marincas v. Lewis*, 92 F.3d 195, 204 (3d Cir. 1996)) *abrogated on other grounds in Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 126 S. Ct. 2422 (2006). Neutrality is absent where the Judge acts as an advocate for one side or where bias or prejudice prevents the judge from considering relevant facts or law. *See Reyes-Melendez v. INS*, 342 F.3d 1001, 1007-08 (9th Cir. 2003) (due process absent where Immigration Judge's moral contempt for litigant based on his infidelity prevented consideration of relevant facts and made judge a "partisan adjudicator.") (citations omitted); *United States v. Singer*, 710 F.2d 431, 436-37 (8th Cir. 1983) ("a trial judge cannot assume the mantle of an advocate").

Elaine raises eight bases to show the appearance of bias or prejudice, or a lack of neutrality. These can be divided into roughly three categories: 1) Judge Bufford's alleged "advocacy" for Vickie by providing the District Court a "Secret Memo;" 2) rulings and statements made by Judge Bufford during the Vickie Lynn case; and 3) Judge Bufford's contact

1  with the press and press accounts of the proceedings in the Vickie Lynn case. Even considering

2  these grounds in toto, the reasonable inference of bias or prejudice is wanting.  Thus, recusal is

3  unwarranted under section 445 or on due process grounds.

4              1.      The "Secret Memo"

5        Elaine is correct that impartiality can reasonably be questioned, and due process violated,

6  where a judge steps into an advocate's role for one side or another.  *See Reyes-Melendez*, *supra*.;

7  *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 166 (3d Cir. 1993) ("a judge's participation

8  in a case must never reach the point where it appears, or is even perceived to appear, that the

9  judge is aligned with any party in the pending litigation.")  For instance, where a judge conducts

10  an independent investigation or confers with witnesses outside of counsel's presence, section

11  455(a) requires recusal.  *In re United States*, 441 F.3d 44, 66-68 (1st Cir. 2006) (recusal under

12  section 455(a) required where judge stays pending criminal matter to conduct investigation of

13  potential misconduct concerning the grand jury); *In re Edgar*, 93 F.3d 256, 358-60 (7th Cir.

14  1996) (*ex parte* meeting with experts who had come to favor one party requires recusal under

15  section 445(a)).  Likewise, where the judge suggests his preferred resolution of a case, recusal is

16  warranted.  *See Furst*, 886 F.2d at 583 (judge suggests that he desires guilty plea).

17        However, no similar conduct took place in this case.  Even accepting Elaine's allegations,

18  Judge Bufford submitted a memorandum to the District Court suggesting that the bankruptcy

19  reference should not have be withdrawn.  Withdrawal of the bankruptcy reference is based on

20  balancing factors such as judicial economy, cost, and delay of hearing the case in the Bankruptcy

21  Court or the District Court.  *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993).

22  Judge Bufford, who had considerable experience with the case, likely had the best understanding

23  of whether the case would proceed most expeditiously in the Bankruptcy Court or the District

24  Court.  The fact that he wrote the District Court to request that the case not be withdrawn merely

25  suggests that he wanted to retain jurisdiction over the case, not that he had any bias or prejudice

26  against Pierce.  A desire to keep a case, particularly one that a judge has devoted substantial time

27  and effort to, does not suggest bias or prejudice.

28        Elaine points to no authority for the proposition that two judges working on the same

matter cannot discuss it out of the parties' presence.  It is wholly appropriate for judges to seek advice on pending cases from more experienced colleagues.  There is no prohibition on Bankruptcy Judges discussing the propriety of withdrawal with the District Court.  *Cf. Rapp v. Van Dusen*, 350 F.2d 806, 812-13 (3d Cir. 1965) (discussing procedure for District Court to respond to Mandamus petition where District Court is nominal party).  No Canon of Judicial Conduct makes commonplace banter among judges grounds for recusal.

### 2.    Rulings and Comments in the Vickie Lynn Case

Next, Elaine suggests that various rulings and comments by Judge Bufford in the Vickie Lynn case show that he was biased or prejudiced against Pierce.

Judge Bufford's rulings fail to add materially to the inference of bias or prejudice.  At the outset, the Court notes that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."  *Liteky*, 510 U.S. at 555.

The sanctions imposed against Pierce do not raise the specter of bias.  An unduly heavy sanction, reduced by a higher court, can be "compelling proof" of bias or prejudice in light of other factors.  *See Offutt v. United States*, 348 U.S. 11, 15-16, 75 S. Ct. 11 (1954).  However, the fact that Judge Bufford thought it appropriate to heavily sanction Pierce and to sanction Vickie less heavily fails to show the deep-seated bias or prejudice necessary to require recusal.  Judge Bufford's decision was based on his perception of Pierce's bad faith, which was affirmed by this Court.  *Id.*  Indeed, although it granted less total damages, this Court nearly doubled the punitive damages awarded by Judge Bufford against Pierce.  This fact precludes a finding that the sanction against Pierce was unduly heavy.

The legal bases for the Bankruptcy Court's decisions also fail to provide sufficient evidence of bias. Although it may be best to stay within the bounds of the parties' argument, the Bankruptcy Court is not barred from independent legal research.  Wrong decisions on the merits of a case are grounds for appeal, not recusal.  *F.J. Hanshaw Enters., Inc.*, 244 F.3d at 1145.

Judge Bufford's negative comments in his rulings or on the record are equally insufficient.  As noted above, even expressions of overt hostility towards a party or counsel are no grounds for recusal unless they are motivated by an extrajudicial source or demonstrate that a

1   fair trial is impossible.  *Liteky*, *supra*.  Although a number of cases have held that a Judge's

2   commentary might call his impartiality into question, *see e.g. Wang v. Attorney General*, 423

3   F.3d 260, 269-71 (3d Cir. 2005), this is not such a case.

4       First, Judge Bufford's comments involve no extrajudicial source.  *See Wang*, 423 F.3d at

5   270 (Immigration Judge's statements were based on her broader views outside of the

6   proceeding).  Quite the contrary, his adverse rulings and comments were based on Pierce's

7   perceived discovery abuse and bad faith.  The fact that, after a case has developed, the judge has

8   a "less than high opinion" of a litigant, is no basis for recusal.  *See Conforte*, 624 F.2d at 881.

9   "Predispositions developed during the course of a trial will [rarely] suffice."  *F.J. Hansaw*

10  *Enters., Inc.*, 244 F. 3d at 1144-45 (citing *Liteky*, 510 U.S. at 544-45).

11      Second, this is not a case where the judge chastised and insulted counsel repeatedly in the

12  presence of the jury, *see Offut*, 348 U.S. at 15-16, or where the judge's statements could be

13  perceived as a comment on the merits of the case before the merits were decided, *see Haines v.*

14  *Liggett Group, Inc.*, 975 F.2d 81, 97-98 (3d Cir. 1992).  Instead, Judge Bufford made the sort of

15  negative comments about Pierce's litigation conduct to be expected where a judge perceives that

16  a party is abusing the judicial process.  Indeed, there was substantial evidence that Pierce was

17  abusing the judicial process as reflected in this Court's award of $44 million in punitive

18  damages.

19      Finally, the Court notes that even if Judge Bufford's rulings or comments disclose some

20  bias or prejudice against Pierce, a "bias" derived from Pierce's bad faith that was also

21  recognized by this Court, it is not the sort of "deep-seated" bias that demonstrates that Judge

22  Bufford could not fairly oversee this suit.

### 3.    Dealings with Press

24      Elaine claims that press commentary on the Vickie Lynn case and the "press conference"

25  held by Judge Bufford on the first day of hearings in the Vickie Lynn case demonstrate bias.

26  Dealing with the press implicates a delicate balance between avoiding improper comment on a

27  pending matter, *see* Canon 3(A)(6) Code of Judicial Conduct, and assuring that the public has

28  the access to judicial proceedings guaranteed by the Constitution. As the Tenth Circuit noted in

1    *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993), the Court must be particularly careful
2    to avoid inappropriate press exposure when a case has extensive notoriety.

3          Press coverage is certainly relevant to whether a reasonable person, in view of all of the
4    facts, would find that a judge's impartiality could reasonably be questioned. *See e.g. Haines*,
5    975 F.2d at 97-98. The press coverage identified by Elaine suggests that Judge Bufford was
6    unfavorable towards Pierce. Although Elaine indicates that Judge Bufford was "aware" of this
7    coverage, she did not suggest that Judge Bufford solicited the coverage or made a single
8    inappropriate comment to the press. There was nothing in the press that would have implied, to
9    a reasonable person, that Judge Bufford had already decided the merits of the suit. *See id*. The
10   gist of the commentary demonstrated, even adopting Elaine's interpretation, that Judge Bufford
11   was unconvinced by Pierce's position. This sort of speculation or conjecture by legal analysts of
12   all sorts is commonplace to cases with the sort of notoriety seen here and would not cause a
13   knowledgeable layperson to question Judge Bufford's impartiality.

14         Concerning the Bankruptcy Court's dealings with the press, the Court is not convinced
15   that this conduct would call the judge's impartiality into question in the mind of a reasonable
16   observer. As noted previously, the judge made no representation on the merits of the case. *See*
17   *In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001) (district Judge's public comment that
18   one case was more "complex" than another, potentially suggested an outcome on the merits);
19   *Haines*, 975 F.2d at 97-98 (judge's comment reported as deciding merits of case). Judge
20   Bufford's comments were certainly less egregious than those at issue in *Cooley*, 1 F.3d at 995,
21   where a judge made strong comments regarding a hot-button political issue at play in one of his
22   cases and potentially suggested a desired outcome in that case. This is not the sort of
23   "deliberate, repeated, egregious, and flagrant" conduct that justified recusal in *United States v.*
24   *Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001) where the judge commented on the merits of
25   case to news sources and in speeches and gave "secret interviews" that he prohibited reporters
26   from disclosing prior to his ruling on the merits of action. Notably, Judge Bufford made each of
27   his purported negative comments on the record in the presence of counsel. Elaine has submitted
28   no evidence to show that Judge Bufford, his law clerks, or anyone else in his chambers discussed

the matter with the press *ex parte* or off the record.

Further, Judge Bufford's comments do not appear to violate the Code of Judicial Conduct. *See* Code of Judicial Conduct Canon 3(A)(6) ("This proscription [on judicial speech] does not extend to public statements made in the course of the judge's official duties, to the explanation of court procedures, or to a scholarly presentation made for purposes of legal education.")  Judge Bufford mainly advised the press of ways they could access copies of public records or contact the Bankruptcy Court.  His only comment arguably going to the substance of the case was that the Texas Probate Case existed and that some matters might be handled in either venue.  This did not suggest any opinion whatsoever on how those matters should be decided except in the most speculative manner.  This sort of procedural comment in the course of Judge Bufford's duties is permitted by the Code of Judicial Conduct and provides no basis for recusal.  *See Microsoft*, 253 F.3d at 112.

The final issue regarding press coverage of the Vickie Lynn Case is whether Judge Bufford's comments disclosed an "uncommon interest and degree of personal involvement in the matter."  *Cooley*, 1 F.3d at 995.  Vickie's legal woes have proven a veritable headline-generating machine for several years.  This Court is well aware of the press coverage of every machination of the Vickie Lynn case as it made its way to the Supreme Court.  The "in-court press conference" appears a reaction to this media attention.  The substance of Judge Bufford's comments aimed at dealing effectively with the press generated by the case.  Although this Court may have handled things differently, the Court finds no ethical violation or suggestion of bias.  Judge Bufford's comments fall far short of demonstrating that he had a personal stake in the Vickie Lynn Case.

### 4.    Conclusion

In considering the totality of the circumstances, it is important to recognize two additional facts.  First, each of the alleged bases for bias involved the Vickie Lynn Case, not this case.  Pierce's stated reason for not participating in the present case was his fear that Judge Bufford would again sanction him.  However, this fear is not supported by Judge Bufford's conduct in this matter.  Indeed, Judge Bufford ruled in Pierce's favor by finding that Pierce had standing to

1  file motions in the present case despite his failure to file a proof of claim.  An individual cannot

2  rely on a judge's perceived mishandling of one – admittedly unrelated – case as a reason not to

3  participate in another, only to seek the judge's recusal in the later case.

4       Second, Pierce did not seek Judge Bufford's recusal in the Vickie Lynn Case.  It seems

5  disingenuous to now claim that Judge Bufford's conduct in the Vickie Lynn Case demonstrated

6  such a strong bias that Judge Bufford should have recused himself from this separate proceeding

7  when Pierce did not even raise the possibility of recusal in the original proceeding.  If the

8  conduct demonstrated such a "deep seated" bias in Judge Bufford, the Court can discern no good

9  reason why Pierce failed to raise it during that proceeding.  After all, Judge Bufford awarded

10  nearly half-a-billion dollars in sanctions against Pierce in that case.

11       Taken together, the purported grounds for recusal amount to little more than speculation

12  about Judge Bufford's motives for adverse decisions.  However, this sort of speculation would

13  not create the appearance of impropriety in the mind of a reasonable person.  Instead, it plainly

14  appears that, as the Vickie Lynn case progressed, the Bankruptcy Court became convinced, with

15  good reason, that Pierce was acting in bad faith.  As a result, the court was more skeptical of his

16  position and made a number of rulings adverse to him.  This is no basis for recusal.  Elaine has

17  no grounds to complain about adverse rulings and comments of the Bankruptcy Court where her

18  predecessor, Pierce, caused the Bankruptcy Court to make such rulings and comments through

19  his bad faith conduct, confirmed by this Court.  This is not evidence of bias.

20       Accordingly, the Bankruptcy Court's decision on recusal is hereby AFFIRMED.

21  **II.   UNCONFIRMABILITY AND BAD FAITH**

22       Elaine also contends that the bankruptcy court erred by confirming the debtors' Chapter

23  11 Plan and by denying the Trusts' Motion to Dismiss the debtors' Plan.

24       **A.   Unconfirmability**

25       Elaine argues that the confirmation of the Chapter 11 Plan in this case required an

26  unconstitutional application of the Bankruptcy Code because it allowed "clearly, and

27  overwhelmingly, solvent" debtors to discharge their debts.  As noted in Part II.B. below, it is not

28  clear to the Court that Howard and Ilene were solvent when they filed.  Nonetheless, the Court

1  addresses Elaine's argument assuming, *arguendo*, that they were solvent.

2       After considering the issue and the scholarly opinion of Judge Bufford on this point, *In re*

3  *Marshall*, 300 B.R. 507 (C.D. Cal. 2003), the Court is convinced that he was correct in

4  confirming the Chapter 11 Plan in this matter.

5       The Bankruptcy Clause empowers Congress "[t]o establish . . . uniform Laws on the

6  subject of Bankruptcies throughout the United States."  U.S. Const. Art. I, § 8, cl. 4.  In contrast,

7  the Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several

8  States."  U.S. Const., Art. I, § 8, cl. 3.  These powers are "closely related."  *See Ry. Labor*

9  *Executives' Ass'n v. Gibbons*, 455 U.S. 457, 465–66, 102 S.Ct. 1169 (1982).  Each power has its

10  own limits.  The Bankruptcy power is limited in two ways: 1) the statutes enacted thereunder

11  must be "uniform," *see Regional Rail Reorganization Act Cases*, 419 U.S. 102, 156-61, 95 S. Ct.

12  335 (1974); and 2) they must be "on the subject of Bankruptcies," *Continental Illinois Nat'l*

13  *Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co.*, 294 U.S. 648, 669-70, 55 S. Ct. 595

14  (1935) (although not limited to English or Colonial law at the time of the framing, the

15  Bankruptcy power is limited).  The Commerce Clause is limited to regulating commerce among

16  or between the several states, *see United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624 (1995)

17  (Gun-Free School Zone Act exceeds congress' Commerce Clause power), but laws enacted

18  thereunder need not be uniform, *see Sec. of Agriculture v. Central Roig Refining Co.*, 338 U.S.

19  604, 616, 70 S. Ct. 403 (1950) (comparing Commerce and Bankruptcy Powers).  The powers are

20  also exclusive: the Bankruptcy Clause does not provide Congress power to enact general

21  commercial legislation; the Commerce Clause does not provide Congress power to regulate the

22  subject of bankruptcies. *See Gibbons*, 455 U.S. at 468-69.

23       As Judge Bufford recognized, in order to prevent Congress from enacting general

24  commercial legislation under the guise of the Bankruptcy power, there must be some substance

25  to the "subject of Bankruptcies" limitation.  *In re Marshall*, 300 B.R. at 510.  In other words

26  there must be a material distinction between the Bankruptcy power and the Commerce power.

27       Elaine frames this distinction as turning on the solvency of the debtor: if the debtor is

28  solvent, the regulation relates to commerce; if the debtor is insolvent, the regulation relates to

bankruptcy.  *See generally* Thomas E. Plank, THE CONSTITUTIONAL LIMITS OF BANKRUPTCY, 63 TENN. L. REV. 487 (1996) (arguing for a jurisdictional requirement of insolvency in bankruptcy cases).  Alternatively, she contends that, even if there could be some overlap between the two powers, the Court must impose an insolvency requirement to avoid the difficult constitutional question of setting the exact boundary between the commerce and bankruptcy powers.[2]  *See Crowell v. Benson*, 285 U.S. 22, 62, 52 S. Ct. 285 (1932) ("When the validity of an act of the Congress is drawn in question . . .  it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.")

Despite the surface appeal of this argument, the parties have identified no case, and the Court could locate none, that expressly reads an insolvency requirement into the Constitution or the Bankruptcy Code.  Accordingly, the Court would be developing such a requirement out of whole cloth.  For the reasons that follow, the Court concludes that Judge Bufford did not err in declining to do so and finding that "[t]he limits on the application of the Bankruptcy Clause lie elsewhere, not in . . . insolvency."   300 B.R. at 510.

As a statutory matter, precedent in this and other circuits makes abundantly clear that the Bankruptcy Code has no insolvency requirement.  *See In re Stolrow's Inc.*, 84 B.R. 167 (9th Cir. B.A.P. 1988) (citation omitted) ("[n]either insolvency nor inability to pay debts is a prerequisite to seeking voluntary relief under the Bankruptcy Code."); *see also Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074-75 (9th Cir. 2002) (insolvency not required for finding of good faith so long as a result consistent with the purpose of the Code is achieved);[3] *In re Capitol Foods Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007); *In re Intergretated Telecom Express, Inc.*, 384 F.3d 108, 121-22 (3d Cir. 2004).  As Judge Bufford recognized:

[2] Elaine also argues that the requirement of avoiding constitutional questions precludes bankruptcy relief where the debtors are overwhelmingly solvent.  As discussed in the next section, the Court concludes that the debtors in this case were not overwhelmingly solvent.

[3] These interpretations of the Code are binding on the Court and prevent the Court from construing the statute to contain an insolvency requirement, even in order to avoid constitutional conflict.

1     As a statutory matter, it is clear that the bankruptcy law does not

2     require that a bankruptcy debtor be insolvent, either in the balance

3     sheet sense (more liabilities than assets) or in the liquidity sense

4     (unable to pay the debtor's debts as they come due), to file a chapter

5     11 case or proceed to the confirmation of a plan of reorganization.

6  *Marshall*, 300 B.R. at 510.  This rule has the benefit of encouraging debtors to seek

7  reorganization while it is still possible – i.e. "before they face a financially hopeless situation."

8  *Integrated Telecom*, *supra*; *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999) ("the

9  Bankruptcy Code encourages early filing. It is well established that a debtor need not be

10  insolvent before filing for bankruptcy protection.") (citations omitted).

11     Instead of turning on solvency, the relevant distinction is between financially healthy

12  firms, which are not entitled to relief, and financially distressed firms, which are entitled to

13  relief.  *Furness v. Lilienfiled*, 35 B.R. 1006, 1009 (1983) ("Chapter 11 was designed to give

14  those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid

15  ground and try again, not to give profitable enterprises an opportunity to evade contractual or

16  other liability."); *see also* H.R. Rep. No. 595, 95th Cong., 2d Sess. 10 (1978) ("The present

17  purposes of the Bankruptcy Act are twofold: either to *rehabilitate financially a distressed debtor*

18  or to assemble and liquidate his assets for distribution to creditors.") (emphasis added).  Granting

19  bankruptcy relief to the former does not achieve the goals of chapter 11: equitable distribution

20  among creditors, relief from impossible and oppressive indebtedness, maximizing the value of a

21  debtors assets, etc.  *See Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 514-15, 48 S. Ct.

22  1025 (1938); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244-45, 54 S. Ct. 295 (1934); *Williams v.

23  United States Fidelity & Guar. Co.*, 236 U.S. 549, 554-55, 35 S. Ct. 289 (1915).  Because the

24  "good faith" rubric of 11 U.S.C. § 1129(a)(3) assures that a chapter 11 debtor is complying with

25  the purposes of the Code, questions of whether application of the Code is justified are usually

26  analyzed in this fashion.  *SGL Carbon Corp.*, 200 F.3d at 161.

27     As Judge Bufford pointed out, making insolvency an entrance requirement to

28  reorganization would eviscerate the underlying policies of chapter 11.  First, a debtor's solvency

20

1   is frequently elusive, hotly disputed, and factually intensive.  This question is frequently at the

2   heart of a chapter 11 proceeding and subject to proof well after the case has been filed.

3   Requiring a debtor to prove its solvency at the outset would delay the availability of the

4   bankruptcy stay for years in some cases.  For debtors in true financial distress - those "teetering

5   on the verge" of insolvency - it could be impossible to maintain the status quo for such a length

6   of time.  Thus, an insolvency requirement might preclude debtors who could effectively

7   reorganize at the outset of a case from ultimately reorganizing.  Further, as noted above, the

8   absence of an insolvency requirement encourages financially distressed concerns to file early

9   enough to maintain the ability to reorganize.  By requiring a debtor to be balance-sheet insolvent

10  before filing a case under chapter 11, the courts could easily cut off the ability to efficiently

11  reorganize by forcing debtors to wait until their financial affairs were beyond repair before

12  taking advantage of the bankruptcy laws.  Judge Bufford noted that this negative consequence

13  has occurred in countries that do require balance-sheet insolvency as a precondition to

14  bankruptcy relief.  *In re Marshall*, 300 B.R. at 513.  Of course, depriving debtors of the ability to

15  reorganize destroys value and runs contrary to the purposes of the Bankruptcy Code.

16      Instead the distinction between distressed and healthy concerns – what might be called

17  the "teetering on the verge" rule – in conjunction with the requirement of good faith per 11

18  U.S.C. § 1129(a)(3) aptly serve Congress' aims in enacting chapter 11.

19      As a constitutional matter, the Bankruptcy Clause is a limited grant of congressional

20  power.  *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S. Ct.

21  2858 (1982); *Continental Illinois*, 294 U.S. at 669.

22      The "core" of the bankruptcy power is the "restructuring of debtor-creditor relations" or

23  the "general inability of any person to pay his debts."  *Id.*; *Marathon*, 458 U.S. at 71.  Stated

24  differently, the subject of bankruptcies is "nothing less than 'the subject of the relations between

25  an insolvent or nonpaying or fraudulent debtor, and his creditors, extending to his or their

26  relief.'"  *Wright*, 304 U.S. at 514 (citing *In re Reiman*, 20 F. Cas. 490 (1874)).  However, beyond

27  this definition, the Supreme Court has warned against attempts to pin down the exact bounds of

28  the Bankruptcy power.  *Gibbons*, 455 U.S. at 466 ("the subject of bankruptcies is incapable of

final definition"); *Continental Illinois*, 294 U.S. at 669-70 ("limitations have never been explicitly defined, and any attempt to do so now would result in little more than a paraphrase of the language of the Constitution without advancing far towards its full meaning.")

This "insolvent, nonpaying, or fraudulent debtor" formulation is a common thread throughout the Supreme Court's bankruptcy jurisprudence. *See In re* Reiman, 20 F. Cas. 490 (1874); *Continental Illinois*, 294 U.S. at 672-73 (1935); *United States v. Bekins*, 304 U.S. 27, 47, 58 S. Ct. 811 (1938); *Gibbons*, 455 U.S. at 466; *Central Va. Comm. College v. Katz*, 546 U.S. 356, 371, 126 S. Ct. 990 (2006) (citing *Wright*).  In *Hanover National Bank v. Moyses*, 186 U.S. 181, 191, 22 S. Ct. 857, 860 (1902) (quoting *Re Fowler*, 1 Low. Dec. 161), the Supreme Court aptly recognized that the debtor "may be, in fact, fraudulent, and able and unwilling to pay his debts; but the law takes him at his word, and makes effectual provision, not only by civil, but even by criminal process, to effectuate his alleged intent of giving up all his property."  The fact that the Supreme Court views the bankruptcy power as encompassing the debts of nonpaying or fraudulent debtors, in addition to insolvent debtors, strongly counsels against reading an insolvency requirement into the Constitution, and thus the Bankruptcy Code. *See Continental Illinois*, 294 U.S. at 668.

If this is not enough, the expansive breadth of the bankruptcy power has long been recognized. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 587-88 and n.18, 55 S. Ct. 854 (1935) ("The oft-quoted definitions of the bankruptcy power indicate its broad scope.")  As Justice Catron noted in *In re Klein*,

> I hold, it (the bankruptcy power) extends to all cases where the law
> causes to be distributed the property of the debtor among his
> creditors; this is its least limit.  It's greatest, is a discharge of the
> debtor from his contracts.  And all intermediate legislation, affecting
> substance and form, but tending to further the great end of the
> subject – distribution and discharge – are in the competency and
> discretion of Congress.

14 F. Cas. 716, *reported in Nelson v. Carland*, 42 U.S. 265 (1843); *see also Gibbons*, 455 U.S. at

1  466 ("This power 'extends to all cases where the law causes to be distributed, the property of the

2  debtor among his creditors.'" (quoting *Moyses*, 186 U.S. at 186)).

3      The recognized limits on the bankruptcy power are few, and do not point to an insolvency

4  requirement.  *See e.g. Marathon*, 458 U.S. at 87 (limited by Article III) *Gibbons*, 455 U.S. at 473

5  (law targeting specific railroad is not a "uniform" law); *United States v. Security Indus. Bank*,

6  459 U.S. 70, 75, 103 S. Ct. 407 (1982) (bankruptcy power subject to Takings Clause); *Louisville

7  Joint Stock Land Bank*, 295 U.S. at 589 (subject to Fifth Amendment); *Wright*, 304 U.S. 517-18

8  (subject to due process); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-61, 109 S. Ct. 2782

9  (1989) (subject to Seventh Amendment).

10      One might point out the historical underpinnings of the Bankruptcy Power as a basis for

11  an insolvency requirement.  *See* Plank, *supra*. (discussing the history of bankruptcy legislation

12  preceding adoption of the Bankruptcy Clause, specifically English bankruptcy legislation prior

13  to the founding required insolvency as a precondition); *Continental Illinois*, 294 U.S. at 667-68

14  (bankruptcy and insolvency have long been used as convertible terms).  However, there is little

15  to suggest that the Framers adopted an insolvency requirement.  The discussion of the

16  Bankruptcy Clause in the Constitutional Convention was minimal.  The only vote against it was

17  cast by Robert Sheman who opposed the clause for fear that bankrupts would be subject to death

18  as they were in some circumstances in England.  *In re Marshall*, 300 B.R. 514-15 (citing

19  *Gibbons*, 455 U.S. at 472 n.13).  In fact, Justice Story later suggested that the bankruptcy law

20  was "a law for the benefit and relief of creditors and their debtors, in cases in which the latter are

21  unable *or unwilling* to pay their debts."  3 JOSEPH STORY, COMMENTARIES ON THE

22  CONSTITUTION OF THE UNITED STATES § 1108 n.25 (1833) (emphasis added).  This statement

23  suggests that, at the time of the Framing, bankruptcy did not require insolvency.

24      Moreover, the Supreme Court has recognized that the Bankruptcy power is not limited by

25  the laws in effect, or the prevailing view of bankruptcy, at the time of the framing.  *Moyses*, 186

26  U.S. at 187 ("The framers of the Constitution were familiar with Blackstone's Commentaries,

27  and with the bankrupt laws of England, yet they granted plenary power to Congress over the

28  whole subject of 'bankruptcies,' and did not limit it by the language used."); *see also*

*Continental Illinois*, 294 U.S. at 668 ("the notion that the framers of the Constitution, by the bankruptcy clause, intended to limit the power of Congress to the then existing English law and practice upon the subject long since has been dispelled.")  Indeed, the Supreme Court has sanctioned vast expansions of the Bankruptcy power beyond English law over the period since the framing.  *See In re Klein*, 42 U.S. 277 (law permitting voluntary bankruptcy is constitutional); *Moyses*, 186 U.S. at 186 (expansion of bankruptcy legislation beyond traders is constitutional); *Continental Illinois*, 294 U.S. at 675 (law permitting reorganization rather than liquidation is constitutional).  This too counsels against limiting that power in doubtful cases.

The Court has expressly laid out the "most satisfactory approach" to determining the boundaries of Congress' Bankruptcy power:  the Court must look at the Clause "in light of the acts, and the history of the acts, of Congress which have from time to time been passed on the subject . . .." *Id.* at 670.  In summarizing these advances, the Court noted:

> The fundamental and radically progressive nature of these extensions becomes apparent upon their mere statement; but all have been judicially approved or accepted as falling within the power conferred by the bankruptcy clause of the Constitution. Taken altogether, they demonstrate in a very striking way the capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of human activities from 1800 to the present day. And these acts, far-reaching though they be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed.

*Id.* at 671.  Considering the history of bankruptcy legislation, the Court notes that courts and legislators have progressively expanded the bankruptcy power with the Supreme Court's approval.  *See e.g. id.* at 672-73 (sustaining liquidity insolvency as it "does no more than follow the line of historical and progressive development . . ..")  Progressive liberalization of the bankruptcy laws has been the unmistakable trend.  *Id.* at 668.

Further, as the Bankruptcy Court noted, there has never been a requirement for a debtor to prove his or her insolvency before taking advantage of the protections of the Bankruptcy Code.

1   References to insolvency in Title 11 are sparse.  *See e.g.* 11 U.S.C. § 101 (defining "foreign

2   proceeding" and "insolvency"); 11 U.S.C. § 109 (appropriate debtors under Chapter 9).

3   Nowhere does it appear to be a fundamental aspect or limitation on the statute.  Simply put, in

4   Congress' wisdom, it has not chosen to make proof of insolvency a statutory prerequisite for

5   bankruptcy relief.  The Court will not make it a constitutional prerequisite.

6         The Court is unpersuaded by Elaine's argument that allowing solvent debtors to take

7   advantage of the Bankruptcy Code would eviscerate the distinction between the bankruptcy

8   power and the commerce power.  The bankruptcy power is ancillary to the commerce power and

9   necessary to its proper function.  *See* THE FEDERALIST No. 42 (James Madison) ("The power

10  of establishing uniform laws of bankruptcy is so intimately connected with the regulation of

11  commerce, and will prevent so many frauds where the parties or their property may lie or be

12  removed into different States, that the expediency of it seems not likely to be drawn into

13  question.")  The prerequisite of financial distress coupled with the requirement of good faith

14  prevents, in this Court's opinion, any real risk of the bankruptcy power conflicting with the

15  commerce power.

16        In this case, as in most cases, the requirements of good faith and financial distress are

17  sufficient to assure that Court's need not reach the difficult constitutional question of drawing

18  the exact boundary of the bankruptcy power.  True, there may be some cases where the debtor is

19  so far from being insolvent that a question arises as to whether he or she can constitutionally

20  discharge his or her debts in bankruptcy.  As discussed in more detail below, such a case is not

21  presently before the Court.  Imposing an insolvency requirement to avoid this hypothetical

22  question is inappropriate.  In the present case there is no substantial constitutional question to

23  avoid by reading an insolvency requirement into the Bankruptcy Code, and Judge Bufford did

24  not err in failing to impose such a requirement.

25        Accordingly, the Bankruptcy Court's confirmation of Howard and Ilene's Chapter 11

26  Plan is hereby AFFIRMED.

27  **B.    Bad Faith**

28        Under 11 U.S.C. § 1112(b), a bankruptcy court may dismiss a chapter 11 case "for

cause." *In re Marsch*, 36 F.3d, 825, 828 (9th Cir. 1994).  "[C]ourts have overwhelmingly held that a lack of good faith in filing a chapter 11 petition establishes cause for dismissal."  *Id.*  A filing lacks good faith if it is filed in an attempt "to unreasonably deter and harass creditors" and to "achieve objectives outside the legitimate scope of the bankruptcy laws."  *Id.*  Conversely, a filing is in good faith if it is filed in an attempt "to effect a speedy, efficient reorganization on a feasible basis."  *Id.*

The determination of whether a chapter 11 case was filed in good faith "depends on an amalgam of factors and not upon a specific fact."  *In re Marsch*, 36 F.3d at 828 (*quoting In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986)).  Consideration of any specific factor is unnecessary. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).  "Instead, the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'"  *Id.* (*quoting In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984).  The ultimate determination of whether a chapter 11 case was filed in good faith is "based on the totality of the circumstances."  *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074 (9th Cir. 2002).

After considering the parties' arguments, the Court finds that Judge Bufford did not commit clear error in concluding that Howard and Ilene acted in good faith when they filed. Although some of the facts presented are suspicious, in totality it was reasonable for Judge Bufford to determine that the filing was brought on by actual financial distress and not an intent to unreasonably evade creditors.  Accordingly, his decision on this point must be affirmed.

### 1.     The Texas Fraud Judgment

Elaine argues that Howard and Ilene were solvent at the time they filed and merely used the chapter 11 proceeding to avoid the Texas Fraud Judgment or posting an appellate bond. However, Judge Bufford did not err in concluding that the Texas Fraud Judgment or the potential appellate bond brought the debtors to the brink of insolvency and, thus, their filing was in good faith.

"Filing a bankruptcy petition with the intent to frustrate creditors does not by itself 'establish an absence of intent to seek rehabilitation.'"  *In re Cohoes*, 931 F.2d 222, 228 (2nd

1   Cir. 1991) (*quoting Bankque de Financement, S.A. v. First National Bank*, 568 F.2d 911, 917

2   (2nd Cir. 1977)).  Indeed, "there is a considerable gap between delaying creditors…on the eve of

3   foreclosure and the concept of abuse of judicial purpose." *In re Cohoes*, 931 F.2d 222, 228 (2nd

4   Cir. 1991) (*quoting Collier* § 1112.03, at 1112-33).

5        Evidence in the record plainly supports the conclusion that Howard and Ilene did not seek

6   to unreasonably "deter or hinder creditors through abuse of the bankruptcy process." *In re*

7   *Marshall*, 298 B.R. 670.  From a balance-sheet prospective, the Texas Fraud Judgment or the

8   customary supersedeas bond, along with anticipated future litigation, brought Howard and Ilene

9   quite near the brink of insolvency if not over.  This is true no matter whose asset valuation is

10   believed.

11        At the time they filed, Howard and Ilene were subject to the $11 million Texas Fraud

12   Judgment plus more than $1 million in interest. Elaine cannot dispute that the Fraud Judgment, if

13   not actually rendering Howard and Ilene insolvent, brought them near insolvency.  Even under

14   Elaine's estimation, paying this judgment would have required liquidation of the majority of

15   Howard and Ilene's assets, causing a loss of value.

16        Further, it was customary in Texas to require one-and-one-half times the judgment as a

17   supersedeas bond in order to appeal.  Thus, if Howard wished to appeal the Texas judgment he

18   would have been required to post nearly $18 million.  Even under Elaine's calculation of

19   Howard and Ilene's assets, this bond alone would have rendered Howard and Ilene insolvent.

20   The fact that Howard could not obtain financing on the $10,400,000 bond allegedly agreed to by

21   the parties also demonstrates how financially distressed Howard and Ilene were at the time they

22   filed.

23        Finally, in addition to the Texas Probate Case, another family member named Howard as

24   a defendant in a $5 million suit in Louisiana.  Pierce also threatened Howard with another

25   lawsuit for more than $100 million.

26        As the bankruptcy court noted, "[f]iling a chapter 11 case because of the crushing weight

27   of a judgment is not unusual." *Id.* (*citing In re Texaco, Inc.*, 254 B.R. 536, 541 (S.D.N.Y.

28   2000)).  The record supports the conclusion that Howard and Ilene were in financial distress and

1   had some intention of reorganization.  *See In re Cohoes*, 931 F.2d at 228.

2        Moreover, from a liquidity perspective the debtors were close to insolvency.  A

3   preponderance of Howard and Ilene's income went to legal fees incurred in this and other

4   proceedings.  The Debenture was a substantial source of income for Howard and Ilene.

5   However, at some point, due to the threat of litigation, the Trustee stopped making payments on

6   the Debenture.  In combination with the Howard and Ilene's mounting litigation expenses, this

7   brought them close to liquidity insolvency as well.

8        Giving debtors the opportunity to reorganize in response to impending financial distress is

9   the purpose of chapter 11.  The fact that this financial distress was brought on by litigation rather

10  than borrowing is not dispositive.

11       This case is distinguishable from *In re Marsch* and *In re Boynton*.  In *Marsch*, the

12  bankruptcy court found that the debtor's chapter 11 petition was filed solely to delay collection

13  of the restitution judgment and to avoid posting an appellate bond and that the debtor had the

14  financial means to pay the judgment.  *In re Marsch*, 36 F.3d at 829.  These facts are not clearly

15  present in the instant action.  In *Boynton*, the debtors freely admitted that they filed the chapter

16  11 petition to prevent the enforcement of a judgment.  *In re Boynton*, 184 B.R. at 581.  Of

17  course, Howard and Ilene do not admit that this was their purpose in filing bankruptcy.  On the

18  contrary, they maintain that, at the time of filing, they fully expected to pay the Texas Fraud

19  Judgment pursuant to the plan.

20            a.      *Filing Chapter 11 Petition to Avoid Posting Appeal Bond*

21       "The issue of the use of bankruptcy relief in lieu of an appeal bond has been the subject of

22  litigation and there are cases that favor each side of the issue."  *In re Boynton*, 184 B.R. at 582.

23  Cases granting dismissal on bad faith grounds dealt with smaller judgments where the debtor had

24  the ability to satisfy the judgment.  *Id.*  Cases denying the motion to dismiss typically involve

25  larger judgments.  *Id.*

26       The large Fraud Judgment in this case supports a denial of a motion to dismiss on bad

27  faith grounds.  As the bankruptcy court found, the appeal bond in Texas would have cost

28  Howard and Ilene nearly $18 million and that they did not have the liquid assets to post a bond

1  of this size.  *In re Marshall*, 298 B.R. at 684.

2              *b.      Strategic Timing of Filing*

3          In certain circumstances, strategic timing of a bankruptcy petition may support a finding

4  of bad faith.  *See In re Chinichian*, 784 F.2d 1440, 1446 (9th Cir. 1986).  In the instant action,

5  Howard and Ilene filed their chapter 11 petition five days after the probate court asked Howard

6  to transfer assets to Texas to satisfy the fraud judgment and two days before a hearing that might

7  have led to an order that he do so.

8          The bankruptcy court concluded that "it was reasonable for [Howard and Ilene] to file for

9  reorganization under chapter 11 immediately before a judgment enforcement hearing that

10 threatened to dissipate most or all of their assets."  *In re Marshall*, 298 B.R. at 683.  The Court

11 finds no clear error in this interpretation.  As noted, the timing in this case may very well

12 evidence an intention to reorganize in an efficient and speedy manner.  *See In re Marsch*, 36

13 F.3d at 828.

14              **2.      Financial Misrepresentations**

15         Elaine argues that Howard and Ilene made multiple misrepresentations regarding their

16 assets and that these misrepresentations support a finding of bad faith.

17         In determining if a chapter 11 petition was filed in good faith, courts have looked to

18 whether the debtor misrepresented facts in the petition.  *See In re Leavitt*, 171 F.3d 1219, 1224

19 (9th Cir. 1999).  However, as the bankruptcy court noted, "[t]he principal purpose of the

20 schedules in a chapter 11 case is to inform creditors of the nature of the debtor's assets and

21 liabilities."  *In re Marshall*, 298 B.R. at 677.  The schedules are designed "to give interested

22 parties enough information to decide whether they want to engage in further inquiry . . .."  *Id.*

23 (citing 9 COLLIER ON BANKRUPTCY ¶ 1007.03[1] (Alan N. Resnick & Henry J. Sommer, eds.,

24 15th ed. 2003)).  They are not designed to allow the court or creditors to determine whether the

25 debtor is insolvent.  After all, as noted previously, actual insolvency is not a requisite for relief

26 under chapter 11.

27         In cases where courts have found bad faith based, in part, on financial misrepresentations,

28 there has been "numerous [and] largely unexplained inconsistencies."  *In re Chu*, 253 B.R. 92,

98 (S.D.Cal. 2000); *see also In re Leavitt*, 171 F.3d 1219, 1225 (9th Cir. 1999) ("[debtor's] dishonesty pervaded the proceedings.") The bankruptcy court referred to this level of misrepresentation as "wholesale fraud." *In re Marshall*, 298 B.R. at 683.

Although there are discrepancies in Howard and Ilene's representations, they do not represent "the sort of wholesale fraud that might give rise to finding of bad faith." *Id.* Instead, the schedules served to adequately inform creditors of Howard and Ilene's assets and liabilities, despite not getting them exactly right. They were certainly sufficient to allow creditors to determine whether further inquiry was necessary.

Although Howard and Ilene did not assign values to the Debenture and some of their stock, these assets were adequately disclosed so as to inform creditors of their general nature. Indeed, the Debenture was described in a full-page exhibit to the debtors' schedules with sufficient detail to allow for an accurate valuation. Likewise, although Howard and Ilene's stock was given a value "as of July 16, 2002," creditors could have assessed the current value based on publicly-available information.

While the somewhat creative valuations used in the schedules give the Court pause, it would be unrealistic to expect debtors to value their assets and liabilities in a perfectly neutral manner. Where questions exist as to the proper valuation, the parties are almost certain to frame them in the light they find most favorable. Whether the valuations here crossed the line between aggressive and misleading is a factual determination. Judge Bufford did not err in concluding that they were the former.

Further, to the extent that discrepancies existed in the original schedules, these schedules were amended to take into account millions in additional assets. This too supports a finding that the debtors acted in good faith.

### 3.    Absence of Unsecured Debt

Typically, when a court finds bad faith in a chapter 11 filing, "there are only a few, if any, unsecured creditors whose claims are relatively small." *In re Little Creed Development Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986); *see also In re Chinichian*, 784 F.2d 1440, 1445 (9th Cir. 1986) (finding of bad faith based, in part, on the listing of only two unsecured creditors.).

1    Howard and Ilene's unsecured debt separate from the Fraud Judgment totals between

2    $16,000 and $500,000.  These debts include taxes, credit card bills and other unsecured

3    obligations.  The Texas Fraud Judgment is certainly the mainstay of Howard and Ilene's

4    unsecured debt.  The absence of many unsecured creditors and substantial unsecured debt

5    separate from the Texas Fraud Judgment are considerations that weigh against a finding of good

6    faith filing.

7                          **4.      Ability to File a Tenable Reorganization**

8        Inability to propose a plan of reorganization with any reasonable likelihood of

9    confirmation may also support a finding of bad faith.  *In re Chu*, 253 B.R. 92, 95

10   (S.D.Cal.2000).  As the Bankruptcy Court noted, "[a] debtor's showing that a plan of

11   reorganization is ready for confirmation essentially refutes a contention that the case is filed or

12   prosecuted in bad faith."  *In re Marshall*, 298 B.R. at 681.

13       Here, the Bankruptcy Court properly concluded that Howard and Ilene were able to file a

14   tenable plan of reorganization at the time the petition was filed.  Indeed, they did file such a

15   plan, which the Bankruptcy Court confirmed.  Although there is some question as to Howard

16   and Ilene's need for reorganization, the question is not so significant as to find clear error in the

17   Bankruptcy Court's conclusions.

18       Howard and Ilene could not anticipate that Pierce would not file a proof of claim.

19   Accordingly, at the time of filing, they had to assume that the Fraud Judgment would be

20   included among their other debts.  This would not render them so far insolvent that

21   reorganization would be futile or so clearly solvent that it would be unnecessary.  Further, a

22   reorganization would likely have maximized the value of their assets by permitting them to

23   avoid liquidating assets at less than going-concern value.

24       There was no error in the Bankruptcy Court's determination that the Howard and Ilene

25   were able to file a tenable reorganization plan.  This factor weighs heavily against a finding of

26   bad faith.

27                          **5.      Totality of the Circumstances**

28       After consideration of the totality of the circumstances, the Court finds that the

31

Bankruptcy Court did not err in denying Pierce's motion to dismiss on grounds of bad faith.

The record supports a finding that Howard and Ilene were in financial distress and properly relied on relief under chapter 11.  The Texas Fraud Judgment, in combination with their other debts and threatened litigation, rendered Howard and Ilene close to insolvency if not actually insolvent.  In order to satisfy this judgment, they would have been required to liquidate the majority of their assets resulting in a substantial loss in value.  The fact that they filed for bankruptcy relief based in large part on this judgment is unsurprising and fails to support a finding of bad faith.  Additionally, while Howard and Ilene's valuations of their assets are somewhat suspicious, their schedules were sufficient to serve their intended purpose – i.e. to generally apprise creditors of the nature of their assets and liabilities and give creditors sufficient information for further inquiry.  Finally, the debtors proposed a tenable reorganization plan, which took into account the Texas Fraud Judgment.  The fact that Pierce failed to file a proof of claim does not suggest that Howard and Ilene acted in bad faith.

In sum, the record does not establish that Howard and Ilene filed for bankruptcy in an attempt "to unreasonably deter and harass creditors" and as a means to "achieve objectives outside the legitimate scope of the bankruptcy laws."  *In re Marsch*, 36 F.3d at 828.  Rather, it fully supports the Bankruptcy Court's finding that they filed bankruptcy in an attempt "to effect a speedy, efficient reorganization."  *Id.*

Accordingly, the Bankruptcy Court's denial of Pierce's motion to dismiss is hereby AFFIRMED.

## DISPOSITION

For the foregoing reasons, the decisions of the Bankruptcy Court are hereby AFFIRMED. IT IS SO ORDERED.

DATED: March 18, 2009

David O. Carter
DAVID O. CARTER
United States District Judge

32